## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**MANUEL A. LOPEZ-RIVERA**,
    Plaintiff,

    v.

**COMMISSIONER OF SOCIAL
SECURITY**,
    Defendant.

Civil No. 20-1280 (BJM)

### OPINION & ORDER

Manuel A. Lopez-Rivera ("Lopez") seeks review of the Social Security Administration Commissioner's ("the Commissioner's") finding that he is not entitled to benefits under the Social Security Act ("the Act"), 42 U.S.C. § 423. Lopez contends that the administrative law judge ("ALJ") wrongly concluded that Lopez's impairments did not meet the level of a "listed" impairment that would by default preclude him from performing substantial gainful activity. Docket No. ("Dkt.") 24. The Commissioner opposed. Dkt. 27. This case is before me by consent of the parties. Dkts. 5, 7. For the reasons set forth below, the Commissioner's decision is **REVERSED** and **REMANDED**.

### APPLICABLE LEGAL STANDARDS

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Sec'y of Health & Hum. Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C.§ 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters

entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Sec'y of Health & Hum. Services*, 955 F.2d 765, 769 (1st Cir. 1991). Substantial evidence means "'more than a mere scintilla.' . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal citation omitted). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Sec'y of Health & Hum. Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

The Commissioner employs a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Goodermote v. Sec'y of Health & Hum. Services*, 690 F.2d 5, 6-7 (1st Cir. 1982). At Step One, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At Step Two, the Commissioner determines whether the claimant has a medically severe impairment or combination

of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At Step Three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1 (the "Listings"), which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to Step Four, through which the ALJ assesses the claimant's residual functional capacity ("RFC") and determines whether the impairments prevent the claimant from doing the work he has performed in the past.

An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant can perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final Step asks whether the claimant can perform other work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At Steps One through Four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Rodríguez v. Sec'y of Health & Hum. Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under Step Five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Sec'y of Health & Hum. Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability

existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Sec'y of Health & Hum. Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The following facts are drawn from the transcript ("Tr.") of the record of proceedings.

On April 5, 2013, Lopez filed an application for child's insurance benefits. Tr. 21. Lopez was born on August 31, 1994 and alleges that his onset date was his date of birth. Tr. 23. Lopez has completed four years of high school through a special education program and has no relevant work experience. Tr. 28, 105. His date last insured was August 31, 2016. Tr. 54. The Commissioner denied Lopez's application for benefits initially, on reconsideration, and after a hearing before an ALJ. Tr. 29, 73, 77. The record before the Commissioner, which included medical evidence, Lopez's self-reports, and reports from various teachers and relatives of Lopez, is summarized below.

### A.  Medical History

On February 4, 2000, one of Lopez's teachers referred him for psychometric and psycho-educative evaluation, noting that he did not pay attention, did not perform his work, had a lot of difficulty with his writing, had trouble following instructions, and could not remain seated for long. Tr. 152. In a March 3, 2000 psychometric evaluation, school psychologist Minerva Martinez Cruz ("Martinez") noted that Lopez was born weighing only 4.5 pounds; that his psychomotor and speech development had been reported to be slow; that he had suffered from reflux, double pneumonia, gastritis, and ear and throat infections; and that although he had had a good school adjustment in kindergarten, he was presenting difficulty finishing his work, and his level of activity and sharing skills were subpar. Tr. 154. Lopez apparently liked being treated like an adult and would self-isolate if others disagreed with him, but generally had good relationships with his

relatives, neighbors, and classmates. *Id*. His height and weight were apparently normal for his age. *Id*. However, he seemed reluctant to perform tasks given to him during the evaluation and had a difficult time following instructions, looking unsure while performing tasks; his work rhythm was quick and impulsive and his motor activity level was high. *Id*. He also expressed himself with less articulate and appropriate language than most children his age and would give up easily, suggesting a poor tolerance for frustration. *Id*. He obtained an IQ score of 80, corresponding to low average; his verbal IQ score was also low average at 86, and his performance IQ score was 78, which fell into the "borderline" category. Tr. 155. Martinez believed that the test results showed that his verbal and performance abilities were not developing at the same pace. *Id*. Lopez displayed normal ability to make practical and common-sense judgements; learn verbally and develop language and vocabulary skills; and think logically and abstractly while making proper associations. *Id*. However, he displayed weak functioning in the following areas: general knowledge acquired through lived experience and education; math reasoning and concentration; and attention and immediate auditory memory. *Id*. Lopez also displayed average ability to sensibly construct components into a whole; plan and perform a task with speed, accuracy, and visual and motor coordination; and discriminate visually between essential and nonessential details. *Id*. However, Lopez displayed weakness in his hand-eye coordination; ability to perceive and reproduce an abstract design; and ability to promptly and accurately establish associations, handle a pencil, and learn under new circumstances. Tr. 156. All of his scores across every category were below the true average except for his vocabulary and language development skills, which were just above the true average. Tr. 156-57. His visual-motor skills were within the expected parameters for his age, but his visual perception and motor coordination skills were low. Tr. 157. Martinez found that Lopez's emotional indicators suggested impulsivity and poor internal control. *Id*. She

recommended that he undergo an individualized education program, an ophthalmological evaluation, and audiological evaluation, a neurological evaluation, a speech pathologist evaluation, and an occupational therapy evaluation; she also recommended that he receive help from a relative to complete his schoolwork, more individual supervision over his work, and undergo behavior modification strategies, and undergo reevaluation in a year, among other things. Tr. 158-59.

On June 29, 2000, Lopez underwent a speech and language evaluation from Dr. Jose Padin ("Dr. Padin"), a speech and language pathologist. Dr. Padin noted that Lopez's psychomotor movement was described as "slow," that he had had ear infections, and that his academic achievement to date had been satisfactory. Tr. 162. Lopez came across as motivated in the situation; however, in order to follow instructions, Lopez had to receive repetition, demonstration, and stimulation. Tr. 163. Lopez was able to tolerate failure, but his work habits were sloppy and impulsive, though he was cooperative. *Id*. He displayed adequate speech and voice in terms of both appearance in function and did not display a lack of fluency or unintelligible speech. *Id*. However, he received moderately low score in picture vocabulary tests and a severely low score when it came to phonetic-articulation synthesis, though his scores across other categories were otherwise average or normal. Tr. 164. His spontaneous speech scores were mostly adequate and functional, though he displayed some difficulty with word diversification and possible difficulties with following instructions and development of reading and writing skills. Tr. 164-65. Overall, Dr. Padin found that Lopez showed moderate to mild difficulties in receptive and expressive content of language as well as severe difficulties with phonetic articulation synthesis. Tr. 166. Dr. Padin recommended that Lopez undergo related therapy once weekly and that he see a psychologist for his IQ, undergo occupational therapy for his motor and perceptual abilities, and see an ophthalmologist for his ocular-motor abilities. *Id*.

On August 8, 2000, Dr. Lesbia Aponte Santa ("Dr. Aponte") diagnosed Lopez with Attention Deficit Hyperactivity Disorder ("ADHD") and noted that he was also at high risk of developing learning disabilities. Tr. 212.

On August 18, 2000, Lopez saw a clinical psychologist who found that he had average to low intellectual functioning as well as attention deficit with hyperactivity and that the conditions may have been interfering with his academic learning. Tr. 168. The psychologist noted that Lopez's psycholinguistic and psychomotor development had been slow and that he was hyperactive. Tr. 171. She also noted that Lopez was withdrawn and irritable, but also healthy and in good interpersonal relationships with his family. Tr. 173. The psychologist administered a Stanford-Binet intelligence test on Lopez, Tr. 169: he was aggressive towards the psychologist, distracted, and uninterested in the intelligence test, which he scored an 81 on, putting him in the low average range. Tr. 174. The psychologist noted that he showed the greatest deficits in attention and concentration, immediate memory, and conceptual thought, as well as recognizing similarities and differences between drawings. Tr. 175. The psychologist also noted that his performance showed greater potential, but that his attention lapses diminished his cognitive functioning. *Id*.

On Lopez's first grade report card, he received mostly F grades. Tr. 178. He showed weakness in distinguishing similarities and differences in color, details, position, and direction; his ability to categorize things, except for his ability to remember things that he had learned the previous day; his perceptual, sensory, and motor abilities, except for his knowledge of parts of the body; certain areas of language development, including his ability to use singular and plural, his ability to use masculine and feminine forms, his understanding of consonants and certain syllables, his ability to read along and to comprehend, and his writing and grammar abilities; his math abilities generally; and his social and emotional development, except for his ability to participate

in extracurricular activities (albeit alone). Tr. 179-86. His school report noted that he did not perform any tasks, that his mind was always wandering, that he does not write or recognize letters, that he does not follow directions or accept help, and that he did not accept either positive or negative feedback from his classmates. Tr. 186.

On June 21, 2003, Lopez underwent a psychological evaluation with Dr. Neftali Rodriguez Olivo ("Dr. Rodriguez"). Tr. 187. Dr. Rodriguez noted that he reflected behavior that was impulsive, active, dominant, and not particularly cooperative. Tr. 188. He noted that he had an IQ of 80 and that his behavior was the product of his parents being separated. *Id*. He also stated that he displayed average to low functioning in his motor development and thought, that he displayed average functioning in his psycholinguistic and communicative spheres, and that he came across as friendly, cooperative, and motivated, but also could reflect anxiety, frustration, and social rebellion, including against authority figures. Tr. 189. His emotional needs appeared to be met, but his IQ reflected some level of slowness in his learning ability. Tr. 190. Dr. Rodriguez recommended that Lopez be placed in a special education program, that he undergo several types of therapy, and that an integral plan be implemented to address Lopez's attention deficit issues. Tr. 191.

On July 18, 2003, Dr. Jose Santos ("Dr. Santos") issued a psychometric evaluation report on Lopez. Tr. 311. Dr. Santos noted that he had slow psychomotor, speech, and language development, and that although Lopez had good relationships with his family members, he spent little time with his classmates. Tr. 312. He showed significant attention difficulties, appeared restless and talkative, and showed extreme difficulty reproducing designs. *Id*. His IQ was tested at 69, which put him in the "upper limit of mental deficiency." Id. Dr. Santos believed that he could have scored higher, but his patterns of inattention and impulsiveness did not permit him to do so.

Tr. 312-13. His verbal scale score was 86, or "average-low," while his performance scale score was 57, or at a level of "mental deficiency." Tr. 313.

On October 13, 2006, Dr. Lisa Marrero Vega ("Dr. Marrero") conducted a psychological evaluation of Lopez. Tr. 226. She noted that his weight was only four pounds and a half ounce at birth, and claimed that while his psycholinguistic development was normal, his psychomotor development was slow, and that he was receiving speech and language as well as occupational therapy. Tr. 227. She noted that he had a history of pneumonia, bronchial asthma, beta thalassemia, and dermatitis. *Id*. She also stated that he had failed both first and second grade. *Id*. Dr. Marrero outlined that Lopez was showing difficulty in learning mathematics and writing and that he also seemed distracted when it came to academics; however, she did not note that he was having trouble learning reading, comprehending, or displaying appropriate behavior. *Id*. She noted that his interpersonal relationships were largely adequate, that he displayed anxiety but no other obvious harmful behaviors, that he had ADHD and that he had received psychological treatment, and that he did not have problems in the home. *Id*. He displayed a positive relationship with Dr. Marrero but negative attention. Tr. 228. His verbal scale on the examination was 83, which put him in the average to low range; his performance and total scores were even lower at 79, putting him in the "borderline" range. *Id*. He also showed perception and visual-motor difficulties with integration, rotation, distortion of form, perseverance, and substitution of lines for dots. *Id*. As a result, Dr. Marrero found that he was displaying anxiety features, emotional immaturity, impulsiveness, and aggressiveness. Tr. 229. Though Lopez was twelve at the time, Dr. Marrero found that his mental age was nine years and ten months. *Id*. However, she did note that one of his strengths was using practical judgment for coping in social situations. Tr. 229.

In an undated questionnaire that appears to be from around the same time (2006), Dr. Eric Martinez reported that it was frequently true that Lopez did not finish what he started; could not concentrate and did not pay attention; could not sit still, appeared restless, and appeared hyperactive; moved around a lot; dreamed aloud and seemed lost in thought; was impulsive; had difficulty following instructions; interrupted; performed careless work; was easily distracted; talked a lot; and did not do his homework. Tr. 232. Dr. Eric Martinez noted that Lopez did not do any homework, spent all day talking with television cartoon characters, had a very short attention span, and (when seated) had a mind that was always wandering. *Id*. He also noted that Lopez displayed reading problems, spelling errors, trouble with organizing events in a sentence, and poor understanding of numerical concepts, but did not note that he had trouble with memory, direction, or his handwriting despite being prompted to do so if true. Tr. 233.

A February 2, 2008 psychological evaluation conducted by Dr. Rodriguez suggested that Lopez was a sickly infant but that his birth process and his mother's pregnancy were normal. Tr. 237-38. Lopez did not have any observable impediment and was cooperative, but he was slow in speech and psychomotor development. *Id*. He was found to have an IQ of 90 and was noted to have been diagnosed with attention deficit and hyperactivity. Tr. 238-39.  Dr. Rodriguez then provides a list of "characteristics of children with specific learning problems"; it is unclear if the items on the list apply specifically to Lopez or if they are instead characteristics common in children with his learning issues. Tr. 239, 241-43.

On an April 2008 Puerto Rican academic achievement test, Lopez obtained a "basic" score on the Spanish portion of the test, too low to achieve any level of proficiency; a "proficient" score in mathematics; and a "basic," or less than proficient, score in English. Tr. 235-36. Several academic reports from November 2009 suggested that Lopez had deficiencies in basic academic

skills and moved at a slow pace; most recommended that he take on a teacher's assistant, noted that he required things to be repeated, and said that he had trouble keeping up with the group. Tr. 259-62. One noted that he had trouble with coherence, expressing himself, and understanding his own writing. Tr. 261.

On May 11, 2010, Dr. Aponte again diagnosed Lopez with ADHD as well as anxiety disorder. Tr. 205. On May 24, 2010, she conducted an EEG on him that revealed normal findings. Tr. 206. On June 23, 2010, Dr. Javier Rodriguez ("Dr. Javier") conducted a psychological evaluation on Lopez. Tr. 335. Dr. Javier's diagnostic impression was that Lopez had ADHD and Asperger's Disorder. Tr. 336. In a December 16, 2010 neurological medical evaluation by Madeline Serrano Carrion ("Serrano"), Serrano noted that Lopez had previously been diagnosed by a psychiatrist with depression and anxiety disorder. Tr. 195. His physical exam revealed largely normal findings except for a short attention span. Tr. 197.

On November 3, 2012, Dr. Neftali Rodriguez filled out a referral form for Lopez in which he noted that he had specific learning problems, a positive attitude, no thought disorder, a blunted affect, poor memory and orientation, and adequate judgment and insight. Tr. 214. He also said that Lopez had generalized anxiety, was overweight, had hypoglycemia, had academic problems, and was on a regimen of Strattera. *Id*. He stated that he had mild limitations relating to his understanding and memory; mostly moderate and mild limitations relating to his concentration and tolerance, but with no limitations regarding his ability to make simple work-related decisions and tolerate a regular workday without interruptions; that he had no limitations when it came to social interactions except for a mild limitation in his ability to work a job that involves a minimum level of interpersonal contact; and mild limitations in his ability to adapt but with no limitations regarding his ability to function outside a protected environment and his ability to detect routine

hazards and take necessary precautions. Tr. 215-17. He noted that he was currently undergoing education tutoring, that he had reasonable accommodations made for him in classes requiring reading and writing, and that he was dyslexic and had generalized anxiety as well. Tr. 217.

In a third-party function report filled out by Lopez's mother Jacqueline Rivera Quiles ("Rivera") dated May 12, 2013, Rivera reported that Lopez lived with her, that she took him to his medical appointments, and that he was studying for two short courses. Tr. 88. She claimed that he had dermatitis, asthma, gastritis, thyroid issues, and attention deficit with hyperactivity. *Id*. She noted that he was able to take classes, study, walk from home to the school, watch TV, listen to music, and work on the computer. Tr. 89. She noted that he did not help take care of any pets or other individuals, that he suffered from anxiety and took medicine to control it, that he kept to himself and talked to himself as a result of his anxiety, that he was jumpy as a result of his anxiety, and that he did not sleep well but sometimes fell asleep in school. *Id*. She also noted that he could not control his bowel movements, could not properly clean himself in that regard, and was incontinent. *Id*. Rivera claimed that he needed reminders to take care of his personal needs and grooming, that he needed help taking his medications, that he would occasionally prepare his own meals but was scared of their gas stove, that he cleaned his own room and would sometimes help clean the house with reminders and prompting, and that he could not wash dishes due to his dermatitis. Tr. 90. He was able to go out and walk, ride in a car, or use public transportation on his own, but did not have a driver's license. Tr. 91. He was also able to shop in stores, online, by phone, or by mail, and was apparently able to take care of his own financial concerns as well. *Id*. Rivera stated that Lopez did not spend time with others, that he needed to be reminded to go places, and that he needed to have someone accompany him when he did go places. Tr. 92. She stated that he was not sociable and did not accept the opinions of others. Tr. 93. She also said that he was

5'4" tall and weighed 260 pounds. *Id*. She noted that he had trouble bending, standing, reaching, walking, kneeling, stair climbing, seeing, remembering, completing tasks, concentrating, following instructions, and using his hands. *Id*. She claimed that he could only walk for fifteen minutes at a time before needing to stop and rest for ten minutes, that he could only pay attention for short periods of time, that he was unable to finish what he started, that he could not follow written instructions due to his medication, and that he could only follow spoken instructions sometimes. *Id*. Rivera claimed that Lopez got along well with authority figures; that he handled stress through medication, distance, and isolation; that he could handle changes in routine slowly; and that when he found himself in situations that he did not fully understand, he could become somewhat aggressive. Tr. 94. She said that he used an umbrella as a cane due to his weight, that he used glasses that had been prescribed to him by a doctor in October 2012 for reading and schoolwork, and that he took Strattera, which made him drowsy and "cleansed" his digestive system. Tr. 94-95. In closing, she noted that he had been in special education classes from 2001 until 2012 and had to drop out in 2012 due to concentration and anxiety issues after trying a new program. Tr. 95.

On June 20, 2013, Dr. Hector Crespo-Bujosa ("Dr. Crespo") conducted a psychological evaluation on Lopez after a referral from the Social Security Administration. Tr. 1100. Dr. Crespo reported that according to Rivera, Lopez had trouble with anxiety, managing money, continence, shopping, preparing meals, driving, doing laundry, and taking his own medications. Tr. 1101. However, Lopez apparently did not have trouble with bathing, dressing, using the toilet, moving around, feeding independently, using the telephone, or helping with chores. *Id*. Dr. Crespo found that Lopez's IQ was 59, which was classified as "extremely low" for his age group. Tr. 1102. His verbal score was 68, which was also classified as extremely low, and his performance scale score

(relating to his motor abilities) was 53, also "extremely low." *Id*. However, Dr. Crespo found that Lopez's function was most likely "borderline," or in other words that he would still be able to comprehend simple, sequential instructions and carry out tasks. Tr. 1104.

Dr. Cristina Rivera Ruiz ("Dr. Rivera") conducted a mental status evaluation on Lopez on June 29, 2016, after he was referred to her by the Disability Determination Program. Tr. 470-71. Dr. Rivera reported that he had a mental health history of frustration, isolation, crying spells, sadness, insomnia, low self-esteem, anxiety, and lack of interest, and that he was resistant to the interview process. Tr. 471. She noted that his medical treatment included Prozac, Ativan, Zyprexa, Lorazepam, and Benadryl, which his sister helped him manage. Tr. 472. She reported that he seemed frustrated and scared, that he cried easily, and that he needed things to be repeated to him, but that he also had appropriate psychomotor activity, that his memory did not seem affected, that he seemed oriented, and that his insight and judgment were fair. Tr. 473. Dr. Rivera found that Lopez had recurrent and severe major depressive disorder and paranoid schizophrenia. Tr. 470. She also noted that he was unable to handle his own funds, that he had difficulty concentrating but adequate understanding, and that he seemed unable to perform daily chores and tasks without assistance. Tr. 478.

In a July 10, 2016 function report filled out by Lopez, he reported that he lived with family and that he could not work due to his anxiety, psychosis, and inability to concentrate. Tr. 127. He reported a routine of waking up, taking his pills, showering, eating, resting, listening to music, showering again, taking his pills again, and sleeping. Tr. 128. He claimed being formerly able but currently unable to study, drive, and go to church; however, he claimed having no problems with personal care and stated that he did not need reminders to take care of his personal needs, though he did report needing someone else to give him his medication. Tr. 128-29. He said that he was

able to prepare his own food daily, but that he could not cook complete meals; he also reported cleaning his room, sweeping, mopping, and washing the dishes twice a week, though he needed outside motivation and direction. Tr. 129. He stated that he went outside once a week, that he was able to walk and ride in a car alone (though he did not report being able to use public transportation), and that he could not drive due to his condition. Tr. 130. He also claimed being able to shop in stores, but not by phone, mail, or computer. *Id*. He additionally claimed that he was able to handle his own money matters. *Id*. Lopez reported sometimes being able to go to the movies and being able to watch TV daily; he claimed that he spent time talking with and greeting others twice a week; he said that he went to the mall and to medical appointments around twice a month, though he needed to be reminded to do so and needed to have someone accompany him; and he stated that he had no trouble getting along with family, friends, neighbors or others, though he did report that he could sometimes not leave his home due to his anxiety. Tr. 131-32. He reported trouble with bending and concentrating due to his weight, anxiety, and psychosis. Tr. 132. Lopez said that he could only walk ten minutes before needing to stop and rest for five minutes; he also claimed that he was able to pay attention for around ten minutes, finish what he started, and follow written and spoken instructions. *Id*. He claimed to get along with authority figures fine; handle stress by keeping to himself, drinking water, and showering; have normal reactions to changes in routine; have no unusual behavior or fears; and use glasses daily but not a cane. Tr. 133. He noted that he took Prozac, Ativan, Zyprexa, and Benadryl, and that the Ativan made him drowsy and increased his appetite, the Benadryl also made him drowsy, and the Zyprexa made him wakeful. Tr. 134. The function report was otherwise largely consistent with his mother's report.

In a July 10, 2016 third-party function report filled out by Lopez's brother, Manuel Lopez Rivera ("Manuel"), he noted that he saw Lopez once or twice a week at their mother's house, that

he did not hold coherent conversations, that he was unable to follow instructions, and that he did not maintain composure under pressure or stress. Tr. 144. He noted that his conditions caused him to sleep restlessly, that he washed the dishes every day if reminded, and that he swept and mopped once a month if reminded. Tr. 145-46. Manuel neglected to fill out portions of the report regarding transportation, shopping, and money matters, but did note that Lopez did not maintain a real understanding of income and expenses. Tr. 148. He also noted that Lopez did not spend time with others, that he would sometimes attend church but did not need to be reminded to go places, and that he had trouble getting along with family, friends, neighbors, or others due to arguing about imaginary problems. Tr. 148-49. Manuel noted that Lopez had trouble completing tasks, as well as concentrating, understanding, and following instructions, but did not note that he had trouble bending; he also claimed that Lopez had difficulty writing and reading fluently as well as difficulty maintaining coherent conversations. Tr. 149. He said that Lopez did not finish what he started, but that he could sometimes follow written and spoken instructions. *Id*. He also stated that Lopez would be either compliant with or disrespectful towards authority figures depending on the day; that he used to help a relative conduct a business, but he was removed from his role due to his attitude; that he was very limited in his ability to handle stress and changes in routine; and that he had delusions of persecution. Tr. 150. Manuel did not note that Lopez used glasses or a cane. *Id*. He said that Lopez's Prozac gave him insomnia and anxiety, that the Antivan made it difficult for him to sleep, and that the Zyprexa gave him weight gain, but did not note any side effects of the Benadryl. Tr. 151. Manuel closed by noting that Lopez's condition had made him an antisocial and difficult person to handle in any work setting and that the medications he was taking precluded him from performing any job. *Id*. Manuel's responses were otherwise largely consistent with Lopez's responses from the same day.

In a July 12, 2016 third-party function report filled out by Lopez's sister, Rosa Lopez Rivera ("Rosa"), she reported spending between eight to twelve hours a day with him, giving him his medications, accompanying him to his medical appointments, and helping him shop. Tr. 136. She claimed that Lopez's conditions did not allow him to be patient or skillful and that he could not concentrate or work. *Id*. She noted that sometimes his anxiety did not allow him to sleep. Tr. 137. Rosa also noted that he was unable to pay his own bills, though she claimed that he was able to handle other financial matters on his own; she clarified that Lopez really did not know about his actual expenses, that he did not have a savings account because of his psychosis, and that he would spend all of his money on food due to his anxiety. Tr. 139-40. She also claimed that he no longer left the house regularly due to stress. Tr. 140. She noted that he had trouble with concentrating, understanding, and following instructions, but did not note that he had trouble bending; she stated that he had trouble concentrating and following directions due to his anxiety and trouble understanding because of Asperger Syndrome. Tr. 141. She also said that he could finish what he started, pay attention for ten to fifteen minutes, follow written instructions, and follow mostly just simple spoken instructions. *Id*. She stated that he normally handled stress with medication and otherwise isolated himself. Tr. 142. Rosa reported that he handled stress in a normal way and that he did not exhibit any unusual behavior or fears. *Id*. She also did not report that he used glasses or a cane. *Id*. Her answers were otherwise largely consistent with Lopez's report from two days earlier.

### B.  ALJ Proceedings

On February 19, 2019, Lopez appeared at a hearing before an ALJ. Tr. 36. Lopez testified that while attending school, he had concentration, memory, speech, and occupational problems; he also testified that he went to therapy and was under constant supervision. Tr. 43. Lopez claimed

that he failed first grade three times. Tr. 43-44. He also testified that at times he did not manage to finish his homework because of concentration problems and not being able to obtain help from his family. Tr. 47. He averred that he would sometimes get angry, sometimes have anxiety attacks, and that his medication would sometimes cause him to overeat. Tr. 48. He noted that he worked helping his father maintain a hot dog cart for a while, but that his father stopped having him do so when he saw that Lopez was not good at performing maintenance on the cart. Tr. 48-49. He also testified that he studied cooking at a college briefly, but he left because he felt afraid of emotionally hurting someone. Tr. 49. He noted that he gets depressed and frustrated when he cannot do something well. Tr. 51.

A medical expert, Dr. Jose Rolon Rivera ("Dr. Rolon"), testified that Lopez was suffering from bronchial asthma. Tr. 55. Dr. Rolon noted that his FVC, or the volume of air that he could exhale when trying to breathe in and then out as deeply as possible, was 54% as of June 17, 2013; he also testified that Lopez did not meet Listing 3.03. Tr. 55-56. Dr. Rolon also testified that the record reflected that Lopez did not have a thyroid condition. *Id*.

Medical expert Dr. Windalis Caro ("Dr. Caro") testified that, based on the IQ tests administered to Lopez as well as evaluations conducted by Dr. Rodriguez, Dr. Crespo, Dr. Rivera, and others, Lopez did not meet Listing 112.11, stating that he assessed all four functional areas under paragraph B as moderate; Dr. Caro also appeared to indirectly claim that Lopez would not meet Listing 12.11 either. Tr. 58-65. Dr. Caro acknowledged that there had been some relatively severe findings over the years, but that residual findings regarding Lopez suggested that he would ultimately not meet the 12.11 criteria. Tr. 66-69.

Dr. Ariel Cintron ("Dr. Cintron"), vocational expert, testified regarding the capacity of hypothetical individuals to perform jobs existing in significant numbers in the national economy. Tr. 69-72. Dr. Cintron's testimony is not challenged here.

The ALJ announced her decision on March 4, 2019. Tr. 29. The ALJ found that Lopez had not attained age 22 as of the onset date, that he had not engaged in substantial gainful activity since the onset date, and that he had the severe impairments of bronchial asthma, extreme obesity, and ADHD. Tr. 23.

Proceeding to Step Three, the ALJ found that Lopez did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. *Id*. In support of this determination, the ALJ noted that she had considered Listings 3.03 and 12.04, but that Lopez's conditions did not satisfy the required criteria. Tr. 23-24. The ALJ did not cite any evidence in support of her opinion regarding 3.03 and did not cite any evidence in support of her opinion regarding 12.04 beyond noting that Lopez had "reported that he could shop and attend medical appointments independently." *Id*. The ALJ did not reference Paragraph A criteria at all; she did reference Paragraph B and Paragraph C criteria in relation to 12.04, however. Regarding the four functional areas under Paragraph B, the ALJ found that Lopez had mild limitations when it came to understanding, remembering, or applying information; interacting with others; and concentrating, persisting, or maintaining pace. Tr. 24. The ALJ made inconsistent statements regarding the fourth functional area, adapting or managing oneself; the ALJ either found that Lopez had a mild or moderate limitation. *Id*. As a result, the ALJ found that the Paragraph B criteria were not satisfied, as Lopez would have to have at least two marked limitations or one extreme limitation to satisfy the criteria. Tr. 25. The ALJ also found that the Paragraph C criteria were not satisfied. *Id*. Again, the ALJ did not cite any actual evidence in coming to these

determinations beyond the aforementioned statement regarding Lopez's purported ability to shop and attend medical appointments on his own. Tr. 24-25. However, she did claim that the RFC assessment that she provided reflected the degree of limitation that she found in the Paragraph B analysis. Tr. 25.

In determining Lopez's RFC, the ALJ noted that Lopez had reported being able to groom himself, perform daily chores, pay bills, shop at the store, use the computer, and watch TV. Tr. 26. The ALJ claimed that the overall record reflected that Lopez's symptoms were controlled with treatment and imposed "mild to moderate limitations" in his ability to maintain attention. *Id*. She acknowledged that he had been diagnosed with ADHD as of 2000 but noted that a psychological evaluation reflected that he was still able to perform simple tasks; she also stated that he had been described as attentive and able to complete simple tasks by others despite having moderate difficulties with simple tasks and reading comprehension. *Id*.

The ALJ cited Dr. Neftali Rodriguez's finding that Lopez had moderate limitations when it came to following and performing complex tasks but only mild limitations regarding simple instructions and tasks, according Dr. Rodriguez's opinion significant weight as consistent with findings made in treatment and by teachers and school psychologists. *Id*. She afforded Dr. Crespo's opinion that Lopez's IQ was 59 and that his intellectual functioning was borderline only partial weight because she felt it was inconsistent with "treating sources" and with statements made by Lopez, stating they had reported that he was able to follow and complete simple tasks. *Id*. She also afforded Dr. Rivera's opinion little weight, as she felt that Dr. Rivera's opinion that Lopez seemed unable to perform daily chores and tasks as well as handle funds was inconsistent with Lopez's claim that he could manage his own finances. *Id*.

The ALJ then found that Dr. Caro's testimony that Lopez had moderate limitations in Paragraph B's functional areas was "persuasive and entitled to great weight as to [Lopez's] condition meeting or equaling a listing." Tr. 26-27. The ALJ said this was because Dr. Caro was a specialist familiar with Social Security policy and regulations who had reviewed the full record and provided a detailed explanation of his findings. Tr. 27. The ALJ also stated that Dr. Rolon's testimony that Lopez did not meet any of the listings was persuasive and entitled to great weight because Dr. Rolon satisfied the same criteria as Dr. Caro. Tr. 27-28. As a result, the ALJ found that Lopez's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the record. Tr. 28.

The ALJ then went on to find at Steps Four and Five that Lopez had no past relevant work experience, but that he could perform jobs existing in significant numbers in the national economy. *Id*. These determinations are not at issue here. As a result, the ALJ concluded that Lopez was not disabled under the Act. Tr. 29.

The Appeals Council denied review, Tr. 1, and this action followed.

## DISCUSSION

Lopez only challenges the ALJ's determinations at Step Three, claiming that the ALJ's analysis of the Listings was flawed. Lopez first implies that it was improper for the ALJ to consider the listings for adults and not the listings for children when determining if Lopez had an impairment that met or equaled a listed impairment. This is not the case, as Lopez was well into adulthood when he appeared at the hearing before the ALJ. *See, e.g.*, *Harrold v. Astrue*, 323 F. App'x 114, 116 (3d Cir. 2009) (an individual who had reached the age of nineteen by the time of the hearing before the ALJ should be evaluated with reference to the adult listings despite the

individual having applied for SSI prior to turning eighteen). The ALJ therefore did not err by considering the listings for adults.

However, the ALJ's analysis at Step Three is dissatisfactory in other regards. The ALJ states that she "specifically considered" Listing 3.03 (Asthma),[1] 20 C.F.R. § Pt. 404, Subpt. P, App. 1, and that Lopez's medical conditions did not satisfy the 3.03 criteria, Tr. 23, but she does not provide any analysis of why Lopez's conditions do not satisfy the criteria or otherwise explain this finding. Since the ALJ has failed to provide any analysis of 3.03 whatsoever, her finding is not sufficiently supported.

Furthermore, as Lopez notes, besides 3.03 the ALJ only considers Listing 12.04[2] at Step Three without any explanation as to why. 12.04 deals with depressive, bipolar and related

---

[1] Listing 3.03 reads as follows:

> A. FEV$_1$ [(the volume of air exhaled in the first second when performing a forced expiratory maneuver, or maximum inhalation followed by a forced maximum exhalation)] less than or equal to the value [associated with] your age, gender, and height without shoes (see [table in] 3.00E3a) measured within the same 12-month period as the hospitalizations in 3.03B. . . .

> AND

> B. Exacerbations or complications requiring three hospitalizations within a 12-month period and at least 30 days apart (the 12-month period must occur within the period we are considering in connection with your application or continuing disability review). Each hospitalization must last at least 48 hours, including hours in a hospital emergency department immediately before the hospitalization. Consider under a disability for 1 year from the discharge date of the last hospitalization; after that, evaluate the residual impairment(s) under 3.03 or another appropriate listing.

[2] Listing 12.04 reads as follows:

> A. Medical documentation of the requirements of paragraph 1 or 2: 1. Depressive disorder, characterized by <u>five</u> or more of the following: a. Depressed mood; b. Diminished interest in almost all activities; c. Appetite disturbance with change in weight; d. Sleep disturbance; e. Observable psychomotor agitation or retardation; f. Decreased energy; g. Feelings of guilt or worthlessness; h. Difficulty concentrating or thinking; or i. Thoughts of death or suicide. 2. Bipolar disorder, characterized by <u>three</u> or more of the following: a. Pressured speech; b. Flight of ideas; c. Inflated self-esteem; d. Decreased need for sleep; e. Distractibility; f. Involvement in activities that have a high probability of painful consequences that are not recognized; or g. Increase in goal-directed activity or psychomotor agitation.

> AND

> B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F): 1. Understand, remember, or apply information (see 12.00E1). 2. Interact with others (see

*Manuel A. Lopez-Rivera v. Secretary of Health and Human Services.,* Civil No. 20-1280 (BJM)          23

disorders. 20 C.F.R. § Pt. 404, Subpt. P, App. 1. However, the ALJ found that Lopez had bronchial

asthma, extreme obesity, and attention deficit hyperactivity disorder ("ADHD") as severe

impairments, but not depression or bipolar disorder. Tr. 23. It is unclear why the ALJ focused

solely on 12.04 instead of addressing Listing 12.11[3] (which, as Lopez notes, the ALJ discussed at

some length with a medical expert at the ALJ hearing) or perhaps even another listing such as, for

example, 12.05[4] (which deals with intellectual disorders). The ALJ does not explain this decision.

---

12.00E2). 3. Concentrate, persist, or maintain pace (see 12.00E3). 4. Adapt or manage oneself (see 12.00E4).

OR

C. Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both: 1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); <u>and</u> 2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

[3] Listing 12.11 deals with neurodevelopmental disorders and reads as follows:

A. Medical documentation of the requirements of paragraph 1, 2, or 3: 1. One or both of the following: a. Frequent distractibility, difficulty sustaining attention, and difficulty organizing tasks; or b. Hyperactive and impulsive behavior (for example, difficulty remaining seated, talking excessively, difficulty waiting, appearing restless, or behaving as if being "driven by a motor"). 2. Significant difficulties learning and using academic skills; or 3. Recurrent motor movement or vocalization.

AND

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F): 1. Understand, remember, or apply information (see 12.00E1). 2. Interact with others (see 12.00E2). 3. Concentrate, persist, or maintain pace (see 12.00E3). 4. Adapt or manage oneself (see 12.00E4).

[4] Listing 12.05 reads as follows:

A. Satisfied by 1, 2, and 3 (see 12.00H): 1. Significantly subaverage general intellectual functioning evident in your cognitive inability to function at a level required to participate in standardized testing of intellectual functioning; and 2. Significant deficits in adaptive functioning currently manifested by your dependence upon others for personal needs (for example, toileting, eating, dressing, or bathing); and 3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

OR

B. Satisfied by 1, 2, and 3 (see 12.00H): 1. Significantly subaverage general intellectual functioning evidenced by a or b: a. A full scale (or comparable) IQ score of 70 or below on an individually

  The ALJ does not consider Paragraph A criteria in her analysis. This also goes unexplained. 12.04, 12.05, and 12.11 all contain Paragraph A criteria that should be considered as part of the analysis of each listing. The error of not considering Paragraph A criteria is often harmless in relation to 12.04 and 12.11, which require claimants to satisfy *both* Paragraph A and Paragraph B criteria (although in the case of 12.04, satisfying both Paragraph A and Paragraph C criteria is an alternate option). *See, e.g.*, *Davis B. v. Berryhill*, 2019 WL 495580, at *3 (D. Me., 2019) (explaining in regards to 12.04 and certain other listings that when a claimant's impairments do not meet Paragraph B and C criteria, "[w]ith respect to paragraph A . . . the error of failing to consider it is harmless" because the error is in favor of the claimant). However, such an error would be much more unlikely to be harmless when analyzing, e.g., 12.05, which can be satisfied by *either* its Paragraph A or Paragraph B criteria rather than by both.

  The ALJ mentions Paragraph C criteria, but she does not actually provide any analysis of the criteria beyond stating that the available evidence "fails to establish" the presence of the criteria. Tr. 25. 12.04 requires that either both Paragraph A and Paragraph B *or* Paragraph A and Paragraph C criteria are satisfied. 20 C.F.R. § Pt. 404, Subpt. P, App. 1. The requirements of 12.04 could therefore be met even if Paragraph B's criteria are not. As a result, it is essential that the ALJ analyze Paragraph C criteria when considering 12.04. Therefore, the ALJ's findings regarding 12.04 are not sufficiently supported.

---

administered standardized test of general intelligence; or b. A full scale (or comparable) IQ score of 71-75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and 2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: a. Understand, remember, or apply information (see 12.00E1); or b. Interact with others (see 12.00E2); or c. Concentrate, persist, or maintain pace (see 12.00E3); or d. Adapt or manage oneself (see 12.00E4); and 3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

As the Commissioner notes, the Paragraph B criteria are the same under both 12.04 and 12.11, so if the ALJ properly found that the 12.04 Paragraph B criteria were not met, then the 12.11 Paragraph B criteria would not be met either. A claimant cannot meet 12.11 if he does not satisfy the Paragraph B criteria, so in theory any failure by the ALJ to consider 12.11 could be harmless here. However, this would not necessarily be true if the ALJ had evaluated, for instance, 12.05, and a non-frivolous argument could be made that the ALJ should have done so. Moreover, the ALJ's Paragraph B analysis is overly cursory and ultimately flawed. The Paragraph B criteria for 12.04, 12.05, and 12.11 lay out four functional areas. In order to meet or equal the criteria, a claimant must have extreme limitations in at least one of the four areas or at least marked limitations in two of the four. The ALJ appears to have found that Lopez only had mild limitations in all four functional areas. However, the ALJ does not explain why; she states the criteria underlying the four functional areas, but she does not provide any specific analysis of why Lopez failed to meet the criteria beyond mentioning that Lopez "reported he could shop and attend medical appointments independently." Furthermore, it is not clear whether the ALJ found that Lopez had mild or moderate limitations when it came to adapting and managing himself. Though the ALJ opens her discussion of this functional area by stating that Lopez had a "mild" limitation when it came to adapting and managing himself, she states later in the same paragraph that "[a]s for adapting and managing oneself, [Lopez] had a moderate limitation."

In defense of the ALJ's determination, the Commissioner states that Lopez bears the ultimate burden of proving that he was disabled. This is true, but although Lopez is responsible for providing the Commissioner with all known evidence that relates to his purported disability, it is the Commissioner's job to develop that evidence. 20 C.F.R. § 404.1512; 42 U.S.C. § 423(d)(5)(B). The ALJ has not demonstrated that the evidence has been developed here.

*Manuel A. Lopez-Rivera v. Secretary of Health and Human Services.*, Civil No. 20-1280 (BJM)          26

The Commissioner also claims that substantial evidence supports the ALJ's determination. The ALJ's analysis at Step Three contains multiple flaws. It is true that if substantial evidence nonetheless supports the ALJ's determination, then the flaws would constitute harmless error. *See, e.g.*, *Pagan v. Sec'y of Health and Hum. Services*, 819 F.2d 1, 3 (1st Cir. 1987) ("We must affirm the Secretary's resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence"). Nonetheless, "the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [the Commissioner], not for the doctors or for the courts." *Rodriguez v. Sec'y of Health & Hum. Servs.*, 647 F.2d 218, 222 (1st Cir. 1981). The ALJ offers no evidence to support her findings at Step Three other than mentioning that Lopez could shop and attend medical appointments independently. Alone, this is not enough evidence to support any of the ALJ's findings at Step Three. Therefore, if there is any conflict in the evidence before the ALJ as to whether Lopez might meet a listing at Step Three, then Lopez's case should be remanded to the ALJ. If any flaws in the ALJ's analysis do not constitute harmless error because of a conflict in the record, then Lopez's case will be remanded for further proceedings.

As noted above, the ALJ's determination regarding Listing 3.03 is flawed because the ALJ fails to provide analysis of the listing, but this flaw appears to constitute harmless error. One requirement under 3.03 is that the claimant be hospitalized at least three times within a twelve-month period for over 48 hours each time. 20 C.F.R. § Pt. 404, Subpt. P, App. 1. Lopez makes no claim that he underwent such hospitalizations, and the record does not reflect that he meets this requirement. As a result, the ALJ's lack of analysis regarding 3.03 is harmless. *See Pagan*, 819 F.2d at 3.

Regarding the rest of the ALJ's analysis at Step Three, in support of the notion that substantial evidence supports the ALJ's determination, the Commissioner notes evidence cited by the ALJ within her RFC analysis. The ALJ also claims that her RFC assessment reflects the degree of limitation that she found in the Paragraph B analysis. Tr. 25. However, this evidence is inconsistent with the ALJ's other findings at Step Three. For instance, the ALJ notes that Dr. Caro found that Lopez had moderate limitations in three out of the four Paragraph B functional areas, but the ALJ found that Lopez only had mild limitations in at least two of those areas despite stating that Dr. Caro's testimony was "persuasive" and "entitled to great weight as to Lopez's condition meeting or equaling a listing." Other evidence cited by the ALJ also appears to support a finding that Lopez had at least moderate limitations when it came to concentrating, persisting and maintaining pace at least as much as it supports a finding of mild limitations; the ALJ even acknowledges that "[t]he overall record denote[s] . . . mild *to moderate* limitations in [Lopez's] ability to maintain attention." Tr. 26 (emphasis added). Moderate findings in the Paragraph B functional areas would not support overturning the ALJ's determination, as Lopez's limitations would still have to be worse than moderate in at least two out of the four areas to satisfy the Paragraph B criteria. However, these inconsistencies show that the ALJ's RFC analysis does not serve to clarify the ALJ's findings at Step Three, but instead muddies the findings further. Incidentally, the ALJ's RFC analysis also fails to account at all for her finding that Lopez did not meet listing 3.03; asthma is not mentioned at all within the analysis, and although there is a brief reference to a lung issue suffered by Lopez, the ALJ provides no analysis of the issue. There is no analysis that obviously pertains to the Paragraph A or Paragraph C criteria either. The RFC analysis therefore does not serve to correct any aspect of the ALJ's flawed analysis at Step Three.

Meanwhile, the record contains evidence that is certainly at least arguably in conflict with the ALJ's determination at Step Three. For instance, as noted above, Lopez's siblings claimed that Lopez was unable to take care of his own financial matters, complete tasks, or follow instructions. The ALJ noted in determining Lopez's RFC that the opinions of Dr. Crespo and Dr. Rivera were accorded "partial" and "little" weight in part (or in the case of Dr. Rivera, entirely) because they were somewhat in conflict with Lopez's self-assessment that he could complete simple tasks, follow simple instructions, and manage his own finances. The opinions of Dr. Crespo and Dr. Rivera would have otherwise potentially undercut the ALJ's Step Three determination; for instance, Dr. Rivera found that Lopez showed difficulty concentrating. However, the ALJ does not explicitly make any determination regarding the credibility of these self-assessments, which even Lopez's own siblings disagreed with. Given that one aspect of Lopez's claims is that he has difficulty with understanding, comprehension, attention, and following instructions, there is arguably reason to believe that his self-assessments could be flawed and that his siblings' assessments, as well as Dr. Crespo and Dr. Rivera's, could be more accurate than his own. Accordingly, the ALJ should make an explicit determination regarding the credibility of Lopez's self-assessments if the ALJ cites them upon remand. *Cf. Hynes v. Barnhart*, 379 F. Supp. 2d 220, 224 (D.N.H. 2004) ("The ALJ's RFC determination must provide a clear explanation for its evidentiary basis and reasons for rejecting medical source opinions"). The ALJ also fails to cite other evidence that may or may not conflict with her findings but that should be evaluated. For example, the record reflects that Lopez had adverse reactions to the medications he was taking, and at least one medical expert believed that Lopez had Asperger's Syndrome. The ALJ made no mention of these issues in her opinion.

At least one other expert opinion that goes uncited by the ALJ, Dr. Eric Martinez's, conflicts with her Step Three findings as well. Dr. Martinez reported, among other things, that it was frequently true that Lopez did not finish what he started; could not concentrate and did not pay attention; could not sit still, appeared restless, and appeared hyperactive; moved around a lot; dreamed aloud and seemed lost in thought; was impulsive; had difficulty following instructions; interrupted; performed careless work; was easily distracted; talked a lot; and did not do his homework. Tr. 232. On its face, Dr. Martinez's opinion conflicts with the ALJ's findings that Lopez only had mild limitations when it came to understanding and applying information; concentrating, persisting, and maintaining pace; and managing himself.

Many other parts of the record arguably conflict with the ALJ's findings as well, but I find it unnecessary to reference the rest of the record here, as it is already clear that remand is warranted due to conflicts in the record that have not been addressed. It is quite possible that the ALJ's findings will ultimately prove to be correct, but her analysis as presented in her determination is clearly flawed in several respects; furthermore, the record contains evidence that she does not adequately address and that at least arguably conflicts with her findings. On remand, the ALJ should also consider if analysis of any Listings besides 12.04 is warranted and explain why or why not. As a result, I find it necessary to remand for further proceedings.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **VACATED** and **REMANDED** for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 18th day of January 2022.

S/ *Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge